FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

2015 MAY 29  P 4: 09

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| CURTIS A. EVANS and WHIPGOLF, LLC, ) <br><br> Plaintiffs, ) <br><br> v. ) <br><br> PLUSONE SPORTS, LLC, ) <br> a Massachusetts limited liability company, ) <br> and ALEX VAN ALEN, ) <br><br> Defendants. ) | C.A. No. __1:15CV683 CMH/TCB__ <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs, Curtis A. Evans ("Evans") and WhipGolf, LLC ("WhipGolf"), for their complaint against Defendants, PlusOne Sports, LLC ("PlusOne") and Alex Van Alen ("Van Alen"), for breach of contract, declaratory judgment, damages, and injunctive relief, including attorneys' fees and costs, allege as follows:

### Jurisdiction and Venue

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy exceeds $75,000.

2.      This Court has personal jurisdiction over Defendants because contractual negotiations occurred in this district and by the contractual agreement of the parties.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  The parties also contractually agreed to venue in this District.

4.     This Court has personal jurisdiction over Evans because he is a citizen and resident of the Commonwealth of Virginia. Evans is the sole member of WhipGolf. WhipGolf is a limited liability company and, therefore, has the same citizenship as Evans.

5.     This Court has personal jurisdiction over PlusOne, which is a Massachusetts limited liability company with its principal place of business in Amesbury, Massachusetts, and Van Alen, a Massachusetts citizen, because they entered into a contract with Plaintiffs specifying venue as a state or federal court in the Commonwealth of Virginia.

6.     The amount in controversy exceeds $75,000. Plaintiffs seek, in part, $50,000 in accelerated royalties.

7.     In addition, Plaintiffs seek an injunction to enjoin any further manufacture, use, or sale of the subject product by Defendants. Van Alen has advised Evans that the Defendants possess 5,000 units of inventory and sell each unit for approximately $160.00. Thus, the injunctive relief seeks to enjoin the Defendants from selling $800,000 worth of inventory. In the Fourth Circuit, the value of an injunction for amount in controversy purposes equals the larger of the injunction's worth to the plaintiffs or the cost to the defendants. *Dixon v. Edwards*, 290 F.3d 699, 710 (4th Cir. 2002).

**The Parties**

8.     Evans invented an apparatus for throwing a golf ball a long distance for use in the new sport of "throw golf." On February 28, 2012, Evans filed a provisional patent application with the United States Patent & Trademark Office (the "USPTO"), No. 61604176, for "Projectile and throwing apparatus and game for projectile throwing." On February 27, 2013, Evans filed U.S. Patent Application 13/779,676 (the "Evans Application"), claiming priority to the

provisional application.   The Evans Application published on May 29, 2014 as US 2014/0144417.

9.      WhipGolf is a limited liability company organized under the laws of Delaware. Evans is the sole member and manager of WhipGolf.

10.      PlusOne is a Massachusetts limited liability company with its principal place of business in Amesbury, Massachusetts. PlusOne manufactures sporting goods equipment for throw golf. Van Alen is the Chief Executive Officer and sole member of Plus One.

### A.      PlusOne Contacts Evans After Discovering His Application

11.      On about July 30, 2014, two months after the Evans Application published, counsel for PlusOne, Edward Gates ("Gates") contacted Evans by phone to discuss the Evans Application.   Gates discovered the Evans Application in the course of providing patent prosecution services to PlusOne.   PlusOne had filed its own patent application, which the USPTO rejected in light of the prior-filed Evans Application.

12.      During the initial telephone call, Gates advised Evans that one of Gates's clients (later identified as PlusOne) was about to commercially release, or was already selling, a product for throwing a golf ball that practiced at least one invention disclosed in the Evans Application. Gates represented that Evans had priority of invention and that PlusOne was interested in licensing the Evans Application and the patents that might result from it.

13.      Evans agreed to speak with Gates's client about a license to the technology disclosed in the Evans Application. Shortly after the initial call with Gates, Gates and Van Alen called Evans to introduce PlusOne and express a desire to license the technology disclosed in the Evans Application. Evans expressed a willingness to discuss a license, if the parties could agree on business terms, but was reluctant to rush into a new licensing relationship with PlusOne.

Evans later explained he was reluctant to spend much time negotiating because (1) PlusOne was a start-up company run by someone without prior experience in bringing any sporting goods product to market; (2) PlusOne had no brand equity whatsoever, but was introducing the marks "FLINGGOLF" and "FLINGSTICK" for equipment for the sport of throw golf; (3) Evans preferred to license a reputable company in the lacrosse or golf market segments that could offer immediate brand recognition, manufacturing capabilities, economies of scale, existing sales and marketing operations and budgets, and/or access to existing distribution channels; and (4) Evans wanted guaranteed royalty payments and was concerned about PlusOne's ability to pay royalties. Evans explained that he intended to continue, at the right time, discussions with other potential licensees, including those he had already contacted.

14. After these initial conversations, Van Alen and Evans had regular, periodic, and extensive discussions by telephone and email to attempt to negotiate a license. Gates participated in some of these calls and email exchanges, and Van Alen represented that all of the negotiation discussions were being shared with Gates for the purpose of obtaining legal advice. Van Alen also had other business partners and consultants who were providing him assistance and advice throughout the licensing negotiating discussions. These people included an advisory board and investors, which comprised sporting goods industry professionals (the former CEO of Burton Snowboards and Specialized Bicycles), golf course industry professionals, Van Alen's brother (a start-up business advisor and investor), and other legal counsel.

### B. The Parties Negotiate a Non-Exclusive License

15. Van Alen sent Evans a license proposal, by email, on August 14, 2014. PlusOne desired an exclusive license, with right to sublicense, for a royalty of 3% net. PlusOne also

proposed a reduction in the royalty rate if the proposed exclusive license was converted to a non-exclusive license, with the non-exclusive license bearing a royalty of 0.75% net.

16.     Van Alen and Evans spoke on August 27, 2014 about the proposed license. Evans rejected the offer for a number of reasons, including that Evans was not interested in granting an exclusive license to a start-up company and that the proposed royalty rate was far too low and was not based on gross sales.

17.     Van Alen sent Evans another license offer, by email, on August 28, 2014, which Evans again rejected.

18.     Evans sent Van Alen a "Discussion Memo Regarding Licensing" on August 29, 2014 (the "Memo"). The Memo was a 6-page analysis of what Evans believed to be the proper royalty rate, and explained that Evans only wanted to consider granting a non-exclusive license. The Memo also proposed three options to continue negotiation: a royalty-only deal; a hybrid royalty-plus-equity agreement; and an equity only arrangement.

19.     Evans and PlusOne continued to negotiate the terms of the license PlusOne desired and Van Alen and Gates suggested that the parties meet in person to continue their discussions. On about September 26, 2014, Van Alen flew from Boston to meet with Evans in Alexandria, Virginia, to continue their negotiations.

20.     The negotiations continued throughout September and October of 2014, and the parties exchanged numerous draft term sheets and heavily negotiated the terms of their contractual relationship. At all times, Van Alen and PlusOne were represented by counsel, who drafted and negotiated the terms.

21.     Evans consistently rejected any offer for an exclusive license.

22.    During the course of negotiation, the parties agreed upon a "Licensee covenant,"
which recited that:

> The parties agree the [PlusOne] FlingStick is a licensed Product
> because it infringes a Valid Claim, and royalties will be paid
> thereon.

Contemporaneous correspondence indicates PlusOne intended to induce Evans into an agreement

with guarantees to pay royalties, for example Van Alen stating that:

> I have no intention of trying to avoid royalties on the [PlusOne]
> Flingstick. . . . First, the [patent Application] claim does not even
> need to be actually patentable or patented. . . . Respecting the
> existing [PlusOne FlingStick] product and your concerns expressed
> below, there is no dispute and you do not have to worry. We are
> taking a license because we believe that your application supports
> claims that can be presented in good faith which cover the
> [PlusOne] FlingStick product.   I understand whether you
> ultimately get them may not be resolved for many years, which is
> the normal [sic]. Ed [Gates] says the minimum amount of time
> would be 4 years . . .

23.    On November 2, 2014, Evans and PlusOne finally agreed on the terms of a non-

exclusive license and executed a binding term sheet memorializing their agreement (the "Term

Sheet"). A true and correct copy of the Term Sheet is attached hereto as Sealed Exhibit 1.[1]  Van

Alen executed the Term Sheet as CEO of PlusOne and personally guaranteed PlusOne's

performance.

24.    The Term Sheet required the parties to work in good faith to execute a Non-

Exclusive License Agreement.  Evans promptly sought to comply with this requirement by

drafting a Non-Exclusive License Agreement (sometimes referred to as a Definitive Agreement),

and forwarding it to PlusOne on November 4, 2014.

---

[1] The Term Sheet contains a confidentiality provision, which requires it to be filed under seal.

25.     Gates responded on November 5, 2014, stating that ". . . I agree that it should not be difficult to finalize," but then PlusOne did not respond to Evans for two weeks. On November 18, 2014, counsel for PlusOne replied with a heavily redlined draft of a Non-Exclusive License Agreement that changed material terms from the Term Sheet.

26.     Evans responded the next day, on November 19, 2014, accepting some of the language PlusOne suggested, but Evans rejected PlusOne's changes to material terms and those that were inconsistent with the Term Sheet to which the parties had agreed.

27.     PlusOne responded through counsel on November 24, 2014, setting out a laundry list of "key issues," but refused further to memorialize a Non-Exclusive License Agreement. As Gates explained, **"PlusOne would rather take the risks of no deal** with you than agree to the license terms you have proposed," and he added "continued negotiation will not be fruitful." Some "key issues" in Gates' e-mail contradicted the express terms reflected in the Term Sheet to which the parties agreed.

28.     Nevertheless, Evans emailed PlusOne the next day, November 25, 2014, substantively addressing each and every "key issue" identified by PlusOne. Evans also attached another draft definitive Agreement, in several instances agreeing to changes PlusOne requested.

29.     On December 3, 2014, PlusOne replied to Evans, again through counsel, accusing Evans of "considerable bad-faith conduct" and arguing that Evans' use of verbatim language from the Term Sheet to memorialize the terms of the Term Sheet into a Non-Exclusive License was not in good-faith. Gates stated, "I'm not sure what the next step is, but **PlusOne is disinclined to turn a draft . . ."**

30.     Evans then retained counsel in a further good faith attempt to memorialize the terms of the Term Sheet into a Non-Exclusive License Agreement. Evans's counsel contacted

Gates to attempt to identify what was keeping PlusOne from recording the terms of the Term Sheet, and to remind PlusOne that the Term Sheet was itself a binding and enforceable agreement. Those discussions did not proceed productively.

31.     On January 1, 2015, Evans emailed PlusOne to remind it that the first guaranteed annual minimum royalty payment of $10,000 was due on January 5, 2015.

32.     On January 4, 2015, Van Alen emailed Evans to inform him that (1) PlusOne would not make any payment to Mr. Evans; (2) PlusOne was unilaterally ceasing discussions regarding the memorialization of the Term Sheet into a Non-Exclusive License Agreement; and (3) PlusOne was purporting to unilaterally and immediately terminate the Term Sheet in light of Evans' unidentified breach of the Term Sheet.

33.     On January 6, 2015, Evans, through counsel, provided PlusOne notice that there was a delinquency in payment of the guaranteed annual minimum royalty payment. PlusOne did not cure this deficiency within 10 days of the notice of delinquency. PlusOne's failure to cure its default within the allotted time constitutes a Default under the Term Sheet.

34.     PlusOne negotiated and agreed to specific consequences for failure to make a guaranteed payment. The consequences recited in the Term Sheet include:

   1.     Permitting Licensor Evans to terminate the license.

   2.     Permitting Licensor to invoke the Acceleration clause.

   3.     Permitting Licensor to enjoin PlusOne from further manufacture, use, or sale of the FlingStick product.

   4.     Permitting accrual of interest at 1.5 per cent per month.

   5.     Permitting Licensor to collect from Van Alen personally, since he personally guaranteed timely payment.

35.    PlusOne breached the Term Sheet in other ways as well. Under the Term Sheet, PlusOne had a duty to bring to Evans's attention "any prior art or other information known to [PlusOne] that is relevant to the patentability or validity of any licensed patent." PlusOne knew of relevant prior art, but failed to disclose such prior art to Evans.

36.    In January 2015, Evans learned that PlusOne was prosecuting its own patent applications, and that PlusOne submitted on several occasions extensive lists of prior art in Information Disclosure Statements ("IDS") to the USPTO. PlusOne never provided this information to Evans as required by the Term Sheet. Evans only learned PlusOne had been submitting IDSes to the USPTO after PlusOne's patent application, No. 14/259,855, published on January 8, 2015.

37.    The USPTO issued an initial rejection of PlusOne's patent application on July 15, 2014, largely in view of the Evans Application. PlusOne contacted Evans for a license shortly thereafter. The USPTO issued a final rejection of PlusOne's patent application on December 23, 2014, with many claims again being rejected in view of the Evans Application. PlusOne argued to the PTO that its claims were patentable over the Evans Application and all prior art, while simultaneously signing a Licensee Covenant that the subject "FlingStick" product infringes a Valid Claim of the Evans Application. PlusOne has not disclosed to the USPTO its belief that its product infringes a Valid Claim of the Evans Application.

38.    PlusOne also agreed to use due diligence to market and sell the "FlingStick" branded product. In November 2014, PlusOne had the following marks active at the USPTO:

1) "FLINGGOLF," Serial No. 86104293 to an equipment-only class of goods "Outdoor activity game equipment sold as a unit comprising of a stick for playing games", and

2) "FLINGSTICK," Serial No. 86104357 to an equipment-only class of goods "Outdoor activity game equipment sold as a unit comprising of a stick for playing games."

PlusOne filed each as an "intent to use" application, and knew or should have known that further action was required to protect each mark or to use the federal circle-R ("®") symbol with the marks.

39.     In violation of its obligations under the Term Sheet, PlusOne knowingly abandoned its federal registration for the marks "FlingStick" (Serial No. 86104357) and "FlingGolf" (Serial No. 86104293) on December 1, 2014, but misused the marks with a circle-R designation thereafter.   PlusOne's conduct constitutes trademark misuse.   As a result of abandonment of the marks and/or trademark misuse, PlusOne breached its contractual obligation to use due diligence to market and sell the "FlingStick" branded product.

40.     PlusOne also had a duty to disclose to Evans any third party manufacturer used by PlusOne. PlusOne never provided such disclosure, which constitutes a breach of the Term Sheet.

41.     PlusOne also had a duty to provide Evans reasonable access to its records and a report of its gross sales. PlusOne never provided Evans any access to its records or a report of its sales, which constitutes a breach of the Term Sheet.

42.     On March 6, 2015, Evans, via counsel, sent Defendants a formal notice of PlusOne's Default. In this letter, Evans invoked the acceleration clause, demanded immediate payment, and suspended PlusOne's right to make, use, or sell any Licensed Product until all outstanding amounts were paid.

43.     PlusOne refused to make any payment due under the Term Sheet. PlusOne also continued to make, use, and sell Licensed Product.

44.     PlusOne also continued to make, use, and sell Licensed Product falsely advertising the products as being associated with registered trademarks "FLINGGOLF" and "FLINGSTICK" when no federal trademark registration existed. PlusOne continued to market, advertise, and sell products using the circle-R designation, which constituted trademark misuse.

45.     At all times after March 2, 2015, PlusOne continued to make, use, and sell Licensed Product after receiving and with knowledge of the suspension of PlusOne's right to make, use, and sell Licensed Product.

46.     On April 16, 2015, Evans, via counsel, again (1) reminded PlusOne that it could not unilaterally terminate the Term Sheet, especially while it remained in material default thereof; (2) sought immediate payment of the accelerated guaranteed annual minimum royalty payments plus interest; and (3) demanded that PlusOne comply with the terms of the Term Sheet, including without limitation to cease making, using or selling Licensed Product until its defaults were cured.

47.     PlusOne again ignored the request for payment and the demand to cease making, using or selling Licensed Product until its defaults were cured.

48.     Because PlusOne knowingly abandoned its federal registration for the marks "FlingStick" and "FlingGolf" on December 1, 2014 (and thereafter opted not to revive them within the statutory period, thereby providing notice to the public that the marks were available to others), and because PlusOne misused the marks with a circle-R designation after December 1, 2014, in dereliction of its duty of due diligence, and because Evans knew PlusOne's failure to pay royalties could reasonably result in cessation of any lawful commercial sale by PlusOne, WhipGolf filed intent to use trademark applications on February 3, 2015.

49.     Evans is the sole member of WhipGolf, LLC.  WhipGolf, LLC constitutes an "Evans company" under the Term Sheet.

50.     After December 1, 2014 PlusOne used the circle-R symbol adjacent the term "FLINGSTICK" on physical product actually sold, on demonstration equipment used to solicit sales, on advertising, on its website, in conjunction with partners and/or affiliates, and at tradeshows, including golf's most significant annual tradeshow – the PGA Merchandise Show in January, 2015.  PlusOne did not have a federal trademark registration during the time it used the circle-R designation in conjunction with the mark.

51.     After December 1, 2014, PlusOne used the circle-R symbol adjacent the term "FLINGGOLF" on advertising, on its website, on social media accounts, in conjunction with partners and/or affiliates, and at tradeshows, including golf's most significant annual tradeshow – the PGA Merchandise Show in January, 2015.  PlusOne did not have a federal trademark registration during the time it used the circle-R designation in conjunction with the mark.

52.     WhipGolf filed intent to use trademark applications on February 3, 2015, for:

"FLINGGOLF," Serial No. 86522157 in the class "Outdoor activity game equipment sold as a unit comprising a stick for playing games";

"FLINGGOLF," Serial No. 86522197 in the class "Organizing and conducting athletic competitions and games in the field of golf"; and

"FLINGSTICK," Serial No. 86522160 in the class "Outdoor activity game equipment sold as a unit comprising a stick for playing games."

53.     Because PlusOne knowingly abandoned its federal registration for the marks "FlingStick" and "FlingGolf" on December 1, 2014, and failed to revive them within the

statutory period, and because PlusOne misused the marks with a circle-R designation thereafter, WhipGolf is the senior user with respect to the marks "FLINGGOLF" and "FLINGSTICK."

54.     On or about May 11, 2015, the USPTO approved WhipGolf's applications for publication on the Principal Register, including "FLINGGOLF," Serial No. 86522157; "FLINGGOLF," Serial No. 86522197; and "FLINGSTICK," Serial No. 86522160.

55.     PlusOne knowingly abandoned its federal registration for the marks "FlingStick" and "FlingGolf" on December 1, 2014, which marks covered the equipment-only class of goods "Outdoor activity game equipment sold as a unit comprising of a stick for playing games."

56.     On February 6, 2015, PlusOne filed trademark application Serial No. 86526494 for the mark "FLINGGOLF" for the class "stick for playing golf-like outdoor game; organizing golf-like outdoor game." This is a different class of goods than the equipment-only class of goods.     This application was based on an "actual use in commerce," despite PlusOne's knowledge that it had engaged in false advertising, trademark misuse, and had unclean hands because it used the mark with a circle-R designation when it knew it had no federal trademark registration. PlusOne did not inform the USPTO of having used the circle-R designation when it had no federal trademark registration, nor that the "actual use in commerce" was one with a circle-R already being used.

57.     On about May 13, 2015, the USPTO properly refused registration to PlusOne's Serial No. 86526494 for the mark "FLINGGOLF" because of WhipGolf's prior pending applications for the same mark.

58.     On February 5, 2015, PlusOne filed trademark application Serial No. 86522160 for the mark "FLINGSTICK" for the class "stick for playing golf-like outdoor game." This application was based on an "actual use in commerce," despite PlusOne's knowledge that it had

13

engaged in false advertising, trademark misuse, and had unclean hands because it used the mark with a circle-R designation when it knew it had no federal trademark registration. PlusOne did not inform the USPTO of having used the circle-R designation when it had no federal trademark registration, nor that the "actual use in commerce" was one with a circle-R already being used.

59.     On about May 13, 2015, the USPTO properly refused registration to PlusOne's Serial No. 86525461 for the mark "FLINGSTICK" because of WhipGolf's prior pending application for the same mark.

60.     PlusOne engaged in trademark misuse, and has unclean hands with respect to the mark "FLINGGOLF" because it used the mark with a circle-R designation when it knew it had no federal trademark registration. This false advertising and federal registration symbol misuse continued for at least five months. On information and belief, PlusOne's false advertising and misuse of the circle-R designation is ongoing, including with its partners and/or affiliates.

61.     PlusOne engaged in trademark misuse, and has unclean hands with respect to the mark "FLINGSTICK" because it used the mark with a circle-R designation when it knew it had no federal trademark registration. This false advertising and federal registration symbol misuse continued for at least five months. On information and belief, PlusOne's false advertising and misuse of the circle-R designation is ongoing, including with its partners and/or affiliates.

62.     PlusOne sold Licensed Product, which improperly bears the circle-R designation used in conjunction with the mark "FLINGSTICK." PlusOne cannot support an actual use in commerce of a mark when the use in commerce of the mark occurs in conjunction with the misuse of the circle-R designation.

63.     PlusOne's use of the marks "FLINGSTICK" and "FLINGGOLF" were not continuous and without disruption, by virtue of the trademark misuse and unclean hands PlusOne

brought on itself by misusing the circle-R designation from December 1, 2014 through the current date.

64.     Notwithstanding PlusOne's misuse of the federal registration symbol, unclean hands, and failure to notify the USPTO of such misuse, and notwithstanding that PlusOne breached the Term Sheet and lost the right to make, use or sell any Licensed Product as a result, PlusOne continues to make, use, and sell Licensed Product and misuse the circle-R designation when it knows it has no federal trademark registration.

65.     The Term Sheet also required PlusOne to send Evans a sample of each new product PlusOne intended to introduce into the market. PlusOne introduced new products after November, 2014, including the "Patriot," the "Carbonite," and perhaps others. PlusOne did not send Evans these products, in breach of the Term Sheet.

66.     On information and belief, each the "Patriot" and the "Carbonite" continue PlusOne's trademark misuse by improperly using the circle-R designation with the mark "FLINGSTICK".

67.     Any ongoing trademark misuse by PlusOne by improperly using the circle-R designation with the mark "FLINGSTICK" or "FLINGGOLF" is a further breach of the duties that PlusOne owes to Evans under the Term Sheet.

68.     PlusOne also breached the Term Sheet by failing to record the terms of the Term Sheet in a Non-Exclusive License Agreement, by failing to make guaranteed royalty payments due under the Term Sheet, by purporting to terminate the Term Sheet without justification, by failing to disclose prior art material to patentability, by failing to use due diligence to protect registered trademarks, by committing trademark misuse, by failing to disclose its third party

manufacturers, by failing to provide access to records or report gross sales data, and by refusing to arbitrate disputes relating to the Term Sheet.

69.    PlusOne's breach of the Term Sheet irreparably harmed Evans.

70.    Evans allowed PlusOne a license to be a first-mover in this new, young market, and to compete with his own company only under certain terms. Evans suffered and will continue to suffer irreparable harm without these protections. As M.L. Carr, former Boston Celtics Champion and PlusOne investor remarked, "**Innovation in the sports world doesn't come along every day**. The three-point line made major comebacks and last minute upsets possible in the NBA. The two-line pass changed the pace of play in the NHL. Snowboards opened the world of winter sports to an entire generation and revitalized the ailing ski industry. FlingGolf, a new action sport for golf courses, is **the next sports innovation for this era**."

**COUNT I**
**(Breach of the Term Sheet – PlusOne – Damages and Equitable Relief)**

71.    Evans incorporates by reference the allegations contained in paragraphs 1-70 as if fully set forth herein.

72.    On November 2, 2014, Evans and PlusOne executed the Term Sheet, which is a valid, binding and enforceable agreement between the parties.

73.    The Term Sheet required, among other things, PlusOne to work in good faith to memorialize the parties' agreement in a Non-Exclusive License Agreement and to make certain royalty payments to Evans.

74.    PlusOne breached the Term Sheet by (a) failing to record the terms of the Term Sheet in a Non-Exclusive License Agreement, (b) failing to make guaranteed royalty payments due under the Term Sheet thereby committing Default, (c) purporting unilaterally to terminate the Term Sheet without justification and while in Default, (d) failing to disclose prior art material

16

to patentability, (e) failing to use due diligence to protect registered trademarks, (f) committing trademark misuse in a breach of due diligence, (g) failing to disclose any third party manufacturer, and (h) failing to provide access to records or report gross sales data.

75.     The Term Sheet contains an attorneys' fee shifting provision with attorneys' fees and costs payable to the prevailing party.

76.     PlusOne's breach of the Term Sheet has damaged Evans in an amount in excess of $75,000, which includes and is not limited to the guaranteed royalty payments due under the Term Sheet, along with pre- and post-judgment interest, and the attorneys' fees and costs incurred in remedying PlusOne's breach.

77.     The Term Sheet also provides that "Delinquent payment, uncured 10 business days from due date, presents irreparable harm to Licensor, and parties agree to remedy in equity allowing Licensor to enjoin any further manufacture, use, or sale."

78.     PlusOne's breach of the term sheet by failing to cure delinquent payments within 10 business days of their due date, and the irreparable harm to Evans resulting therefrom, permits Evans to obtain the agreed remedy in equity to enjoin any further manufacture, use, or sale of the subject product.

## COUNT II
**(Breach of the Term Sheet Guaranty – Van Alen – Damages)**

79.     Evans incorporates by reference the allegations contained in paragraphs 1-78 as if fully set forth herein.

80.     On November 2, 2014, Van Alen executed the Term Sheet to guarantee PlusOne's performance thereunder. The Term Sheet is a valid, binding and enforceable agreement between the parties.

81.     The Term Sheet required Van Alen to guarantee Plus One's performance.

82.     Van Alen has refused to comply with his guarantee obligations.

83.     Van Alen's breach of the Term Sheet has damaged Evans in an amount in excess of $75,000, which includes and is not limited to the guaranteed royalty payments due under the Term Sheet, along with pre- and post-judgment interest, and the attorneys' fees and costs incurred in remedying Van Alen's breach.

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare that the Term Sheet is a binding and enforceable contract;

B.     Award damages, plus interest, against PlusOne, and/or Van Alen, for breach of the Term Sheet in an amount to be proven at the trial;

C.     Enjoin Van Alen and PlusOne from further manufacture, use, or sale of the subject product;

D.     Award attorney's fees and costs to Evans as a result of PlusOne's breach of the Term Sheet; and

E.     Grant such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand trial by jury for all issues so triable.

Dated: May 29, 2015

LeCLAIRRYAN

Laurin H. Mills (VSB No. 79848)
Andrew J. Narod (VSB No. 79691)
2318 Mill Road, Suite 1100
Alexandria, VA  22314
Tel: (703) 647-5903
Fax: (703) 647-5953
Laurin.mills@leclairryan.com
Andrew.narod@leclairryan.com

BAYARD, P.A.


_____/s/_____

Stephen B. Brauerman (No. 4952)
Vanessa R. Tiradentes (No. 5398)
Sara E. Bussiere (No. 5725)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899-5130
(302) 655-5000

Counsel for Curtis A. Evans